987 So.2d 257 (2008)
STATE of Louisiana
v.
Dominic A. IMBRAGUGLIO.
No. 08-KA-64.
Court of Appeal of Louisiana, Fifth Circuit.
May 27, 2008.
*259 Paul D. Connick, Jr., District Attorney, Twenty-Fourth Judicial District, Parish of Jefferson, Terry M. Boudreaux, Anne Wallis, Thomas S. Block, Trial Counsel, Assistant District Attorneys, Gretna, Louisiana.
Margaret S. Sollars, Attorney at Law, Thibodaux, Louisiana, for Defendant/Appellant.
Panel composed of Judges MARION F. EDWARDS, SUSAN M. CHEHARDY, and GREG G. GUIDRY.
GREG G. GUIDRY, Judge.
The Defendant, Dominic A. Imbraguglio, appeals his conviction of second degree murder of a female infant, a violation of La. R.S. 14:30.1. We affirm.
The Defendant was arrested and indicted for the offense in January of 2004. The Defendant pled not guilty at his arraignment. He later filed various motions. His motion to suppress statements was denied. Trial was held in March of 2007. The Defendant was found guilty as charged by a twelve-person jury. The trial judge subsequently sentenced the Defendant to life imprisonment without benefit of parole, probation, or suspension of sentence. The Defendant's subsequent oral motion for reconsideration of sentence was denied.
Deputy Michael Tucker responded to a general medical call involving an infant on November 25, 2003, at approximately 11:00 a.m. When he arrived, emergency medical services (EMS) personnel informed him that the child, Juliette Reed, was deceased, and had been for some time. The child's mother, Ashley Reed, was visibly upset, shaking and crying. Both Deputy Tucker and Lieutenant Thurman of the Jefferson Parish Sheriffs Office, who was also on the scene, noticed bruising on the child's head and legs, but no exposed tissue.
Reed was questioned by the Deputy. She claimed at first that she had been home the entire night, and that the child was fine when she placed her in the crib at 11:00 p.m., but in the morning, the child was not breathing. Reed stated she and her live-in boyfriend, the Defendant, slept on the floor during the night. When she discovered the child's condition in the morning, she tried to give CPR, and the baby began to vomit throughout the house in various locations. Deputy Tucker noted vomit on the blanket, master bed and mattress, and the floor. In the Deputy's opinion, however, it was impossible for the child to start breathing again and vomit throughout the house given the time period involved.
Upon further questioning, Reed changed her story and told the Deputy that she had been at work from 10:00 p.m. to 6:00 a.m., leaving the child in care of the Defendant. When she arrived home at 6:00 a.m., the child appeared to be healthy and sleeping.
The Defendant appeared calm and unemotional during the questioning, periodically completing Reed's sentences. The Defendant did not offer an explanation or information about the child's injuries. The Deputy then turned the case over to the investigating detectives
At trial, Reed testified that she arrived home with her infant daughter between 5:00 p.m. and 6:00 p.m. the previous night. At that time, Juliette had no bruises, bumps, or other physical injuries.[1] Reed *260 fed Juliette before leaving to get fast food for the adults. When Reed returned, Juliette ate some of the fast food. When Reed left for work at approximately 9:30 p.m., the child was crying, but physically well. Reed got off work the next morning at approximately 4:30 a.m. She did not immediately go home because she was looking for drugs for the Defendant. Before Reed returned home, she spoke to the Defendant. He told her that Juliette had vomited, probably because of the food she ate, but that she was fine, and that they were watching television. When she arrived home, Juliette was in her crib. Reed immediately checked on her, and thought Juliette was sleeping. During that evening, she asked the Defendant to check on Juliette several times. Each time, the Defendant told Reed the child was sleeping. In the morning, when Reed picked up Juliette, the infant was cold. Reed tried CPR to resuscitate Juliette. When Reed opened Juliette's mouth, vomit came out. Reed thought Juliette had choked on her own vomit in her sleep. Reed asked the Defendant to call 911. When he failed to comply, Reed telephoned for help.
Reed claimed that the Defendant told her to tell the first responding police officers that she was at home all night, because the Defendant was afraid of going to jail. She denied the Defendant informed her during her absence that Juliette was still vomiting, or had lost consciousness. She further denied that the Defendant told her that Juliette hit her head, tripped over the front door step, fell off the kitchen counter, or that he dropped Juliette, throwing her across the kitchen.
Sergeant John Drury, formerly with the Jefferson Parish Sheriffs Office Homicide Division, testified that the Defendant gave four statements.[2] In his first, the Defendant admitted that he and the child were alone after Reed left for work. He claimed that nothing happened, that he had no contact with the infant, and he had no idea what happened to her.
The Defendant subsequently asked to give a second statement. In the pre-taped interview, the Defendant told Sergeant Drury that he was lying on the floor, throwing the baby up in the air when she slipped or fell, and hit her head. He claimed that Juliette spun herself before falling to the floor. The Defendant changed his story in the taped interview, claiming that Juliette vomited before he threw her in the air.
The Defendant asked to give a third statement. In the pre-taped interview, he said that he walked outside to get some cigarettes from Reed as she was leaving the house to get the fast food. He later said this occurred when she was going to work. According to the Defendant, "the baby walked out the front, there's a step, and that the baby fell or slipped or tripped on the step and flipped back and hit the head of[Juliette's] head hit the concrete step." (R., p. 510). The Defendant told Sergeant Drury that when he held her, Juliette was unresponsive and not moving, but that after thirty seconds, Juliette looked at him, squirmed out of his arms, and ran off. The Defendant told Juliette to lie down, after which he gave her a bottle and she fell asleep.
*261 In the pre-taped interview, the Defendant admitted he told Reed not to tell the police that he had been alone with Juliette. However, in his taped statement, the Defendant claimed that he just meant that Reed was not to tell her parents because her parents did not want him alone with the infant. According to Sergeant Drury, the Defendant showed little emotion, and did not evidence any despondency or distress about the child's death.
In the pre-taped interview conducted by Sergeant Drury and Detective Donnie Clogher prior to his fourth statement, the Defendant claimed that he was fixing a bottle for the child, and had placed her on the kitchen counter. He said that she "essentially burned her hand ..., spun off the counter, falling to the floor." The Defendant said he picked her up, then threw her to a sofa where she bounced and hit the ground. The Defendant said Juliette was unconscious, and he tried to wake her by shaking and putting water on her. When she did not respond, the Defendant threw her on the sofa, causing her to bounce off and hit the floor again. The Defendant stated that Juliette became responsive, but was still woozy after striking her head on the floor a second time. The Defendant claimed he could tell Juliette was okay, even though she appeared dazed and disoriented. He then fixed her a bottle and put her to bed in her crib.
Sergeant Drury testified that when asked at what point Juliette started to vomit, the Defendant changed his story again. He claimed that after Reed went to get fast food, Juliette tripped on a step outside the house, hitting her head on the concrete porch step. The Defendant claimed he told Reed when she returned that Juliette fell, but not that Juliette was knocked unconscious. The Defendant claimed that the incident in which Juliette fell after being thrown in the air occurred after Reed returned from the restaurant.
Sergeant Drury did not believe any of the various stories related by the Defendant because he said that the stories did not fit with Juliette's injuries. Sergeant Drury said the Defendant never confessed to any intentional acts that would substantiate the injuries sustained by Juliette.
Dr. Karen Ross, an expert forensic pathologist and medical examiner in Jefferson Parish Coroner's Office, performed the autopsy. Based on her observation, the victim had been dead for at least several hours. Dr. Ross testified that external examination of the victim revealed multiple abrasions and contusions over the child's body including her head. The most recent injuries were on the victim's hairline on the forehead and on the back of the scalp. There was also a small abrasion on the victim's back, two contusions on the right side of her trunk, and multiple scars on her arms. The skin was also scraped off in an abrasion on the victim's left hip. In her examination, Dr. Ross did not find burns to the victim's fingers or hands. Dr. Ross stated that a `J' shaped bruise on the victim's right arm indicated that she was struck by a loop-shaped object. The victim also had a couple of round bruises and a rod-shaped bruise on her upper outside left thigh that could indicate that the victim was struck.
The doctor's internal examination revealed a subtle area of abrasion or contusion with small hemorrhages in the hair region on the back of the head. Inside the back of the victim's neck there was a separate area of hemorrhage in the muscles at the base of the skull. According to Dr. Ross, this injury was not consistent with an accident because it is in a recessed area. The contusion beneath the victim's mandible was consistent with someone grabbing the victim by the throat. According *262 to Dr. Ross, this injury was inconsistent with an accidental fall because it is also in a recessed area. The victim also had bruises and lacerations on the side of her tongue, near the back, that Dr. Ross opined occurred when the victim bit her tongue during one of her injuries.
Dr. Ross also found extensive blood clots under the victim's skullcap caused by the application of a blunt force to the victim's head. She stated that there was more than one impact because the blood clots ran together. She counted at least nine impacts. In addition, the victim had several blood clots on the top of her head with at least one in the frontal area on her forehead. Dr. Ross documented evidence of hemorrhage beneath the victim's scalp, the thin layer lining the brain, and the brain. There was also a bruise on the front of the left frontal lobe of the victim's brain, and a fracture at the base of the victim's skull. In Dr. Ross's opinion, "a very significant amount of force [was] required to cause those injuries to the brain and to the base of the skull in that area... with that extensive amount of subscapular hemorrhage." (R., p. 630). According to Dr. Ross, this injury was inconsistent with the victim falling backwards, but could be consistent with a person picking the child up and slamming her against the corner of a counter. According to the doctor, if the victim had fallen two feet and seven inches backward before hitting the floor, she would not expect the injury to the victim's head in the area in which it was found. Rather, she would have expected the injury to be at the back of the victim's head, which would have broken her fall.
In addition, Dr. Ross found abundant hemorrhage all around the victim's optic nerves, as well as in her eye and retina. In order to cause such hemorrhaging to the victim's eyes, the impact would have to have been significant. Dr. Ross testified that usually this type of head injury in victims occurs in motor vehicle or crushing-type accidents with associated fractures. The bone covering the child's eyes was not fractured.
Dr. Ross also testified that the lack of recent defensive wounds on the victim indicated that the victim did not have an opportunity to defend herself after she sustained the head injury. Dr. Ross agreed that the event that caused the head injury could have been sudden and violent. She could not give an exact time of death, but stated death occurred more than two hours after the victim had eaten.
An examination of the victim's organs revealed no congenital defect or anything else that would account for her death. According to Dr. Ross, the victim's injuries could not have been caused by either a short fall from the victim being thrown in the air one or two feet by a person lying on the ground, slipping off a nine-inch step hitting her head and then bouncing on the concrete, or falling off a counter and striking the back of her head. Dr. Ross opined that the victim's injuries were the result of inflicted trauma, not an accident, which caused the victim to have a very rapid, immediate, instantaneous unconsciousness progressing to death.
Dr. Scott Benton, an expert in pediatric forensic medicine, testified linear parietal fractures are commonly found in children who fall and hit their heads, not the fracture pattern found in the victim in this case. According to Dr. Benton, injuries to the back of the victim's head are more common in abuse injuries to the skull. These injuries, as well as brain contusions, are very uncommon or rare in household accidents. Dr. Benton stated that the hemorrhages found in the victim were exceedingly rare in accidental injuries, but exceedingly common in high velocity or *263 severe force abuse cases. In fact, the type of hemorrhage found in the victim is the most common marker in high velocity abuse cases. In addition, the retinal hemorrhages found in the victim are associated more with abuse cases than accident cases.
Dr. Benton disputed the veracity of the Defendant's first statement because there was trauma to the child, and the second statement did not explain all of the victim's injuries. According to Dr. Benton, simply throwing the child in the air absolutely could not cause serious or life threatening trauma.
Dr. Benton testified that the Defendant's third statement also did not account for all the internal injuries found in the victim which would not have occurred from a fall from the distance alleged by the Defendant. In addition, Dr. Benton testified that it would be impossible for a fifteen-month old to sustain the kind of injuries that were found from a trip and fall on the step. In addition, he said that a child falling from a cabinet counter would normally fall forwards, not backwards. In addition, the Defendant's fourth statement attempting to explain multiple impacts did not fit the facts, because an injury from the fall would not cause a bruise that went past the skull.
In Dr. Benton's opinion, the victim did not die as the result of an accident, but from trauma to the head, and that the injuries to the victim's head and other parts of her body were inflicted by someone. Although a short distance fall can sometimes cause fatal head injuries, it cannot cause retinal hemorrhages. Dr. Benton stated that the victim could have bit her tongue during an accident.
The Defendant's mother, Linda Imbraguglio, and his sister, Britney Imbraguglio, testified that they never saw the Defendant act cruelly towards the child. The Defendant's mother claimed that the Defendant was a father figure who cared for Juliette, took her to church, and disciplined the child.
On appeal, the Defendant contends that his statements should have been suppressed because he was denied his right to counsel, and because they were not given voluntarily. He also contends that one of the detectives was allowed to give opinion evidence when he was not qualified as an expert.

MOTION TO SUPPRESS THE STATEMENTS

1) Right to Counsel
In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court found that the Fifth Amendment gives a suspect subject to a custodial interrogation the right to consult an attorney during questioning. See State v. Allen, 06-778, p. 4 (La.App. 5 Cir. 4/24/07), 955 So.2d 742, 748. Police officers are required to explain the right to an attorney to a suspect before beginning the custodial interrogation initiated by law enforcement officers after the person has been taken into custody or otherwise deprived of their freedom of action in any significant way. State v. Allen, 06-778 at 4-5, 955 So.2d at 748. The safeguards regarding the defendant's Miranda right to an attorney are triggered by both a custodial setting and an official interrogation. Allen, 06-778 at 5, 955 So.2d at 748.
After the defendant knowingly and voluntarily waives his Miranda rights, police officers may continue to question a suspect unless or until he clearly requests an attorney. Id. A suspect's invocation of the right to an attorney during the custodial interrogation "`requires, at minimum, some statement that can reasonably be construed to be an expression of a desire *264 for the assistance of an attorney.'" Allen, 06-778 at 5, 955 So.2d at 748 (Citation omitted). Once a suspect requests to have an attorney present, the suspect is not subject to any further interrogation by the police until an attorney has been made available to the suspect, unless the suspect initiates further communication, exchanges or conversations with the police. Id. "Whether the accused actually invoked his right to counsel is an objective inquiry." Allen, 06-778 at 5, 955 So.2d at 748.
The appellate court may consider the evidence presented at trial in addition to the evidence presented at the hearing on the motion to suppress in reviewing the trial court's ruling. State v. Sims, 02-1244, p. 7 (La.App. 5 Cir. 4/29/03), 845 So.2d 1116, 1121, writ denied, 03-2189 (La.8/20/04), 882 So.2d 570.
In the present case, Sergeant Drury conducted all the interviews in which the Defendant gave statements, and the Sergeant said that the Defendant never asked for an attorney. In addition, the Defendant initiated the second, third, and fourth statements, and completed the Jefferson Parish rights of arrestee form with the Sergeant. The Defendant verbally acknowledged his rights, appeared to understand them, placed his initials by each, and signed the form. The Defendant's signature indicated that he had read his rights, waiving them, and was voluntarily answering questions and making a statement. At no time did the Defendant indicate he wanted to stop speaking.
At the motion to suppress hearing, the Defendant claimed he was told by Sergeant Drury that he was not under arrest, and that the officers refused to let him call his mother or a lawyer. The Defendant claims that the officers handcuffed him, placed him in an office, and handcuffed him to a desk. Later, they moved him to an interview room. When the officers returned, he again asked to call his mother or a lawyer, but was told he did not need a lawyer. He then told them that he was not going to say anything, which he repeated as they continued to ask him questions. The Defendant claimed he was not free to leave, because the officers refused to let him go and would not let him call anyone, even though the officers told him that he was not under arrest.
"The credibility of witnesses at a suppression hearing is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness." State v. McGee, 04-963, p. 7 (La.App. 5 Cir. 1/11/05), 894 So.2d 398, 406, writ denied, 05-593 (La.5/20/05), 902 So.2d 1050. Here, the trial judge found the testimony of Sergeant Drury more credible than the Defendant's testimony. Thus, we find the trial judge did not abuse her discretion in rejecting the Defendant's version of the events.

2) Voluntariness of Statements
The Defendant also claims that his statements should have been suppressed because they were rendered involuntary by the coercive atmosphere created by the beatings he received, the prolonged interrogation, and his inability to leave. Instead, he was handcuffed to a chair, continuously and relentlessly interrogated, and physically abused, as shown in the booking and defense photographs. The Defendant's claim that he was beaten in order to obtain the statements should have forced the State to produce appropriate evidence that the consent and statements were made voluntarily. The Defendant contends that the admission of his statements was not harmless, because they were essential to the State's case and key to the jury's verdict.
*265 The State must prove beyond a reasonable doubt that a defendant was advised of his Miranda rights, that he voluntarily and intelligently waived those rights, and that the statement made during the custodial interrogation was freely and voluntarily made and not under the influence of fear, intimidation, menaces, threats, inducement or promises before the inculpatory statement may be introduced into evidence. State v. Sims, 02-1244 at 6-7, 845 So.2d at 1120-21. The determination of a statement's voluntariness is made on a case-by-case basis, and depends on the totality of the facts and circumstances of each situation. State v. Sims, 02-1244 at 7, 845 So.2d at 1121.
Sergeant Drury testified that the Defendant appeared fine, had no obvious injuries when he first encountered him in the Detective Bureau, and did not appear intoxicated. Sergeant Drury testified that no one forced, coerced, promised, induced, or intimidated the Defendant in order to get him to acknowledge that he understood his rights, or to make him talk. As reflected in each of the Defendant's four statements acknowledged by the Defendant, Sergeant Drury advised the Defendant that his rights were still in effect and could be invoked at any time, and that his decision to give a statement could be withdrawn whenever he chose. The Defendant did not ask to stop at any time.
Sergeant Drury testified that neither he, nor anyone else touched or laid hands on the Defendant, or threatened him in any way. Sergeant Drury described the marks on the Defendant's face as acne and scabs. Sergeant Drury testified that the photographs shown to him in court depicted the marks that were on the Defendant's face when he met him.[3] Sergeant Drury testified that the Defendant's physical appearance did not change from the time he met him until he was placed into custody at the "JPCC" (Jefferson Parish Correctional Center). Sergeant Drury said no one made promises, offers, or suggestions that things would go easier for the Defendant if he cooperated or confessed, and no one warned the Defendant not to talk about his treatment during his interrogation.
Detective Clogher testified that he did not hear any screaming or yelling coming from the interview room. Nor did the Defendant complain that he had been beaten, coerced, or forced to talk. The Detective also denied that he or anyone else in his presence or to his knowledge threatened the Defendant, struck him on the top of his head, or held a threatening hand over the Defendant's head. Furthermore, Detective Clogher denied that he and Sergeant Drury took turns beating the Defendant or that the Defendant was handcuffed or restrained in any way. Detective Clogher also denied that he or anyone else in his presence or to his knowledge made the Defendant any promises or induced him to waive his rights or to make the statements.
Lieutenant Thurman observed Sergeant Drury interview the Defendant on several occasions. The Lieutenant never saw Sergeant Drury or anyone else act inappropriately, threaten, or abuse the Defendant, and stated that he would have heard the Defendant scream from his office. Lieutenant Thurman noted that the Defendant did not file any formal complaints against Sergeant Drury or Detective Clogher.
At trial, Reed testified she and the Defendant were in close proximity while they *266 were at the Detective Bureau and that she never heard hollering or screams. She also never heard people yelling at the Defendant or the Defendant being beaten.
In denying the motion to suppress, the trial judge stated that, after reviewing all of the evidence, she believed little of the Defendant's testimony. In every statement, the Defendant said he was not beaten, forced, coerced, or promised anything. The trial judge noted that if the Defendant had been beaten as badly as he said he was that he would have been a "mess," which was not the case. The trial judge also noted that there was no evidence showing bruises on the Defendant's stomach, where he claimed he was beaten. The trial judge found that the marks on the Defendant's face depicted in the photographs looked like acne, which was on his face when Sergeant Drury first saw him. The trial judge found that the Defendant was advised of his rights or reminded of his rights before he made each new statement, and that there was no force, coercion, intimidation, or promises made to the Defendant.
The admissibility of a confession or statement is a determination for the trial judge, whose conclusions on the credibility and weight of the testimony relating to the voluntary nature of the confession or statement are entitled to great weight and will not be overturned unless unsupported by the evidence. State v. Allen, 06-778 at 5, 955 So.2d at 748. Here, we find that the trial judge's determination on credibility was supported by the record. Thus, the trial judge did not err in denying the Defendant's motion to suppress.

OPINION EVIDENCE
In his second assignment of error, the Defendant argues that it was prejudicial error to allow Sergeant Drury to offer an opinion on the Defendant's credibility before the jury, who should have ultimately made the determination. Specifically, the Defendant asserts that Sergeant Drury should not have been allowed to explain why he thought the Defendant made statements that were not truthful because he was not qualified as an expert by the State. The Defendant notes that even expert witnesses are not allowed to offer such opinion testimony.[4]
The testimony of a witness, in the form of opinions or inferences, who is not testifying as an expert is limited to those opinions or inferences which are rationally based on the perception of the witness and helpful to a clear understanding of the testimony or the determination of a fact in issue. La.C.E. art. 701. "Generally, a lay witness can only testify to the facts within his knowledge and not to impressions or opinions." State v. Hubbard, 97-916, p. 16 (La.App. 5 Cir. 1/27/98), 708 So.2d 1099, 1106, writ denied, 98-0643 (La.8/28/98), 723 So.2d 415. However, a lay witness is permitted to draw reasonable inferences from their own personal observations, as long as he also states the observed facts. Hubbard, 97-916 at 16-17, 708 So.2d at 1106. Furthermore, the "the opinion rule should not be applied so strictly as to exclude firsthand testimony that may be several inferences removed from raw sense perceptions, yet more helpful to the jury than mere recitation of *267 such perceptions.'" State v. Casey, 99-23, p. 12 (La.1/26/00), 775 So.2d 1022, 1033 (citation omitted), cert, denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000).
In the present case, Sergeant Drury testified as to his opinion about the truthfulness of the Defendant's explanations for the injuries sustained by the victim based on his own personal observations of the Defendant throughout the interview process. Furthermore, even if the admission was error, it was harmless. "Erroneous admission of evidence requires reversal only where there is a reasonable possibility that the evidence might have contributed to the verdict." State v. Casey, 99-23 at 13, 775 So.2d at 1033. The appellate court must determine whether the error was harmless beyond a reasonable doubt, i.e., whether the guilty verdict actually rendered was unattributable to the error. Id.
In the present case, the officer's testimony was cumulative. Several other witnesses testified that the Defendant's explanations did not make sense when compared to the injuries. Thus, the officer's testimony was not so prejudicial that it constituted reversible error.
Accordingly, the Defendant's conviction and sentence are hereby affirmed.[5]
AFFIRMED.
NOTES
[1] Reed testified that she had previously found bruises on the child's forehead after the Defendant baby sat the child. The Defendant told her that Juliette would hit her head on the bathroom sink when she was trying to walk. Reed also believed at the time that Juliette's injuries were from her rocking chair. In the past, Reed took Juliette to Children's Hospital, at the request of the Office of Community Services ("OCS"). Reed never told OCS that the Defendant abused Juliette. OCS did not remove Juliette from the home.
[2] The taped statements were played for the jury.
[3] Sergeant Drury was shown several photographs of the defendant including one taken in the jail on November 26, 2003, by private investigator Don Carter who was hired by the defense.
[4] The Defendant also argues that he objected when Detective Clogher was allowed to give his opinion on whether Reed was under the influence of heroin when she gave her statement, and when Lieutenant Thurman was allowed to give his opinion that the marks on the Defendant's face were caused by acne. However, the Defendant failed to brief his assignment of error in regards to these claims, and are considered abandoned. See: Uniform Rules, Courts of Appeal, Rule 2-12.4.
[5] The record was reviewed for patent errors in accordance with La.C.Cr.P. art. 920. See, State v. Oliveaux, 312 So.2d 337, 338 (La. 1975); State v. Polizzi, 05-478, p. 18 (La.App. 5 Cir. 2/14/06), 924 So.2d 303, 315.