MARC E. JOHNSON, Judge.
 

 | gThe Defendant, Mark Keller, appeals his conviction of second degree murder, a violation of La. R.S. 14:3o.!.
 
 [1]
 
 We affirm.
 

 
 *923
 
 On June 2, 2005, the Defendant was indicted for the first degree murder of Natasha Butler, a violation of La. R.S. 14:30. The Defendant was arraigned and pled not guilty.
 
 [2]
 
 He subsequently filed two motions to suppress his statement made to the police, seeking to prevent the introduction of any of his confessions or taped statements. Both motions were denied.
 

 |sAfter a three-day jury trial, the Defendant was found guilty as charged. Thereafter, he was sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence.
 

 The body of the victim was discovered when her friend, Kerry Coleman, went to the victim’s house after several unsuccessful attempts to reach her. Coleman arrived there around 9:00 a.m. on September 20, 2004. While checking the outside, he noticed that the back door was blackened. Because all the doors were locked, he kicked in the door to gain entry. Coleman searched for the victim throughout the house, eventually finding her lying dead in the bathroom. Coleman then left the house, asked a neighbor to call 911 and waited for the police. Coleman testified that he did not know the Defendant.
 

 Terrell St. Martin, formerly a Detective Sergeant with the Criminal Investigation Division of the St. John the Baptist Sheriffs Office,
 
 [3]
 
 testified that the office received a call that day about a structural fire at a house where the body of a white female was found. He stated that the victim’s mouth, arms and legs were secured with duct tape. The victim was lying on her side in the bathtub of the master bathroom.
 

 Sergeant Jim Brouwer, with the Crime Scene Division for St. John the Parish Sheriffs Office, testified that there was a lot of black ash soot in the interior of the residence, and that the items inside the residence were in disarray.
 

 Glenn Fontenot with the Louisiana State Fire Marshall’s Office assisted in the fire investigation. He said that there were two separate origins of the fire, but that there was no connection between them. He stated that the lack of oxygen from one fire caused a slow smoldering fire that produced soot that spread throughout |4the house, including the rear bathroom where Butler was found. Fontenot testified that neither fire started accidentally.
 

 Dr. Karen Ross with the Jefferson Parish Coroner’s Office performed the autopsy. She found early changes with decomposition indicating some time had lapsed since the death. The doctor stated that the victim’s airway contained a frothy fluid consistent with any type of asphyxia, and could indicate drowning, suffocation or strangulation. Although there was no water in the bathtub at the time the victim’s body discovered, it had been some time between the victim’s death and when the body was found. Dr. Ross stated that the water could have evaporated or drained out. She classified the cause of death as homicidal violence with asphyxia.
 

 Dr. Ross also noted that the victim’s face and body were covered with soot that
 
 *924
 
 was consistent with the fire. Her airway and lungs, however, were clear of soot which indicates that she was not breathing when the fire started.
 

 Major Robert Hay, Chief of Detectives for the Sheriffs Office, obtained the names of the Defendant and the two co-defendants during the investigation of the homicide. After their investigation implicated the Defendant, he was arrested by Detective Will Stelly.
 

 Detective St. Martin interviewed the Defendant following the arrest. He testified that he advised the Defendant of his constitutional rights before the interview, and that the Defendant waived his right to an attorney on two occasions. Detective St. Martin stated that the Defendant initially denied any involvement with the murder, but later confessed to being at the scene. Detective St. Martin did not recall if the Defendant admitted that he harmed anyone, or if he had the | ¿intention of harming anyone, but the Defendant did accuse Bryan Stewart of harming the victim and tying her up.
 
 [4]
 

 Detective St. Martin testified that he eventually obtained an audio-taped statement from the Defendant that was related to the homicide and burglary. He also talked to co-defendant, Lawrence Anthony Babin, who was being held in the Investigation Division while Detective St. Martin was interviewing the Defendant.
 

 Babin testified that he was interrogated by Detective Stelly, Fire Marshall Carter, Detective St. Martin, and Major Hay on March 11, 2005. Questioning began around 6:00 a.m. when Babin was arrested, and ended at approximately 1:30 p.m. or 1:40 p.m. when Babin gave his statement. Babin stated that he gave a free, voluntary, and truthful audio-taped statement to Detective Stelly concerning the events leading to the victim’s death.
 

 Babin testified that, on September 20, 2004, he and the Defendant, who is his second cousin, went to the victim’s home with Stewart, and that he and the Defendant only intended to burglarize the house. After knocking on the door and receiving no answer, Stewart went around to the back and entered the house from the back door. Stewart then let Babin and the Defendant in through the front door.
 

 While the men were looking around, the victim entered the room. Babin stated that Stewart immediately struck the victim, and then “it was like fighting and all, he had got something to put in her throat and then tied up her ankles and put [expletive] around her neck.” The victim’s body was moved to the bathtub, but Babin stated that no one turned on the water in the tub while he was there. Babin and the Defendant then left the scene, leaving Stewart alone in the house.
 

 | fiBabin claimed that the victim was still alive when he and the Defendant left the scene. He insisted that neither he nor the Defendant killed the victim, but further stated that there was no doubt in his mind that he, the Defendant, and Stewart committed the crime. When asked what crime he was referring to, Babin responded, “My testimony is that we all broke into the house and the result of it was the murder of Natasha Butler.” Babin confirmed his earlier statement made to the police that he never implicated himself or the Defendant in “laying hands on” the victim in order to hurt her, and that neither he nor the Defendant turned on the water in the tub, struck the victim, tied her up, or stuck a sock in her mouth. He further asserted that the Defendant did not tape the vic
 
 *925
 
 tim’s ankles, and did not contribute to the harm suffered by the victim. Babin admitted that he pled guilty to conspiracy to commit aggravated burglary of the victim’s home, and was currently imprisoned on the fifteen-year sentence imposed for that crime.
 

 ASSIGNMENTS OF ERROR
 

 In the appeal, the Defendant first asserts that the trial judge erred in denying the motion to suppress the confession. Second, he contends that the trial judge erred in denying the motion for mistrial premised on the improper opinion testimony of Detective Stelly. Third, he assigns all patent errors.
 

 1) Motion to Suppress the Confession
 

 The Defendant claims that his police statement should have been suppressed because the State failed to prove that his police statement was not coerced and that the police did not ignore his request for counsel.
 

 The State claims that the Defendant was advised of his rights after his arrest using the Advice of Rights Form that he initialed and signed, and again before giving his recorded statement. The State notes that the Defendant admits he agreed |7to talk to the officers. The State further asserts that the trial court was in the best position to judge the credibility of the Defendant’s self-serving testimony.
 

 In reviewing the trial court’s ruling on a motion to suppress, the appellate court may consider the evidence presented at trial in addition to the evidence presented at the hearing on the motion to suppress.
 
 State v. Imbraguglio,
 
 08-64, p. 10 (La.App. 5 Cir. 5/27/08), 987 So.2d 257, 263;
 
 State v. Mollette,
 
 08-138, p. 10 (La. App. 5 Cir. 11/25/08), 2 So.3d 461, 467.
 

 The Defendant testified that he was arrested by six or seven officers at his home, taken to the Detective Bureau, and put in the interrogation room with Detective St. Martin, Fire Marshall Carter, Detective Hymel, and Major Hays. Major Hays, Detective St. Martin and Fire Marshall Carter came and went several times from the room. The Defendant denied that he willingly signed the Advice of Rights form. He contended that he told the detective that he did not want to answer questions and did not want to talk to the police as he did not have anything to say. He also claims that he told them he wanted a lawyer, but the officers told him he could not get a lawyer as he was just there for questioning. The Defendant asserts that, despite his unwillingness to talk and his requests for a lawyer, Detectives Hymel and Major Hay kept questioning him. The Defendant stated he refused to answer questions for a long time, but the officers persisted.
 

 The Defendant testified that Detective Hymel kept grabbing him by the back of his neck and trying to get him to talk, even though he told him that he did not want to talk or answer any questions. He said that another officer was in the interrogation room at the time. The Defendant further claims that Major Hay took out his gun, pointed the gun sideways, and then put it down on the table. The Defendant asserts that Major Hay said, “I know you know something about it,” and then Major Hay told him that he was going to jail for the rest of his life and that he |swouId never see his family again if he did not talk. The Defendant insisted he was afraid because the gun was on the table pointing at him.
 

 In the Defendant’s account of the events, Detective St. Martin kept asking him the same questions, had him listen to Stewart’s recorded statement, and told him that he had to make a statement similar to Stewart’s. The Defendant claims that Detective St. Martin provided information that the Defendant was to use
 
 *926
 
 in his statement to make it similar to Stewart’s, and that he did not know those facts until he listened to Stewart’s statement. The Defendant also said that, during the recording of his statement, the officer stopped recording when the Defendant told the officer he did not want to talk.
 

 At one point in the testimony, the Defendant admitted that he waived his rights accorded a defendant under
 
 Miranda v. Arizona,
 
 884 U.S. 486, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and that he signed the “Advice of Rights” form. He later claimed he did not recall waiving his rights, or indicating that no threats were made against him. The Defendant admitted that he said on the tape that no physical force or threats were made against him, but again claimed he made that declaration because he was threatened with harm if he said anything about the gun that was placed in front of him on the table. He also noted that he was never allowed to talk to an attorney between the time he was arrested and when he was brought to jail.
 

 At the preliminary examination and suppression hearing, Major Hay testified that he was present in the Sheriffs Office when the Defendant and his co-defendants were arrested. Major Hay denied talking to any of the defendants when they were at the Detective Bureau, and stated he was never in the interrogation room with the Defendant. When asked if the Defendant would be incorrect in testifying that Major Hay came into the interrogation room and laid his gun on the |9table, Major Hay responded, “[the defendant] would be an absolute liar.” Major Hay testified that many years ago he implemented a procedure for officers to store their weapons prior to entering an interview room, both for safety and to prevent such accusations against investigators. The process requires any officer, regardless of the law enforcement agency he is affiliated with, to be unarmed when entering an interrogation room.
 

 Detective Feldon Carney testified that he advised the Defendant of his rights at approximately 6:50 a.m. on the morning of March 11, 2005. He testified that the Defendant never told him that he did not want to speak to anyone until he had a lawyer.
 

 Detective St. Martin testified that he interviewed the Defendant after he was read his rights by Detective Carney and signed a waiver of rights form. Detective St. Martin stated that he believed that the Defendant understood his rights and was willing to answer questions without an attorney present. Detective St. Martin also read the Defendant his rights from the form as part of his audio-taped statement, and testified that the Defendant indicated that he understood his rights, was waiving them, and was willing to answer questions without the presence of an attorney. He further stated the Defendant never told him that he did not want to talk to him without his lawyer present, or that he wanted an attorney.
 

 Detective St. Martin said that he did not tell the Defendant that his statement had to coincide with Stewart’s statement, and did not recall if the Defendant actually listened to Stewart’s statement. Detective St. Martin also did not recall if he stopped the tape during the recording of the Defendant’s confession.
 

 At the preliminary examination and suppression hearing, Babin testified that he gave his statement under duress because he was afraid that Major Hay would kill him, and claimed the Major struck him. However, he recanted that testimony hnduring the Defendant’s trial. At trial, Babin explained that, after talking with the Defendant, he made false statements during the suppression hearing in order to get
 
 *927
 
 both of their statements suppressed. Ba-bin agreed that as part of his plea to conspiracy to commit aggravated burglary of Butler’s home he was required to offer truthful testimonial evidence regarding the incident.
 

 a) Right to counsel
 

 The Fifth Amendment gives a criminal suspect subject to a custodial interrogation the right to consult an attorney during questioning.
 
 Miranda; Imbraguglio,
 
 08-64 at 10, 987 So.2d at 268; Law enforcement officers are required to explain the right to an attorney to a criminal suspect before beginning the custodial interrogation initiated by law enforcement officers after the suspect has been taken into custody or otherwise deprived of their freedom of action in any significant way.
 
 Imbraguglio,
 
 08-64 at 10, 987 So.2d at 268. The safeguards regarding the criminal suspect’s
 
 Miranda
 
 right to an attorney are triggered by both the custodial setting and an official interrogation.
 
 Id.
 

 Once the criminal suspect knowingly and voluntarily waives his
 
 Miranda
 
 rights, law enforcement may continue to question a suspect unless or until he clearly requests an attorney.
 
 Imbraguglio,
 
 08-64 at 11, 987 So.2d at 263. A criminal suspect’s invocation of his right to an attorney during a custodial interrogation “requires, at minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.”
 
 Imbraguglio,
 
 08-64 at 11, 987 So.2d at 263-64. (Citation omitted). Once a criminal suspect makes a request to have an attorney present, the suspect is not subject to any further interrogation by law enforcement officers until an attorney has been made available to the suspect, unless the suspect initiates further | j, communication, exchanges or conversations with law enforcement.
 
 Imbraguglio,
 
 08-64 at 11, 987 So.2d at 264.
 

 In
 
 Imbraguglio,
 
 the defendant claimed that his statements should be suppressed because he was denied his right to counsel. At the suppression hearing, the defendant testified that the officer told him that he was not under arrest and refused to let him call a lawyer. The defendant claimed that when he again asked to a call a lawyer, he was told that he did not need one. According to the defendant, the officers also continued to ask him questions after he told them that he was not going to say anything.
 

 The police officer who conducted all of the defendant’s interviews testified that the defendant never asked for an attorney, and that he verbally acknowledged his rights and appeared to understand them. The defendant also placed his initials by each right on the form and signed it. The defendant’s signature indicated that he had read his rights, waived them, voluntarily answered questions, and gave a statement.
 

 The trial judge found the officers’ testimony more credible than the defendant, and denied the motion to suppress. Based on the testimony and evidence, we found that the trial judge did not abuse his discretion in his credibility determination and factual findings.
 
 Imbraguglio,
 
 08-64 at 12, 987 So.2d at 264.
 

 In reviewing a trial court’s ruling as to the admissibility of a confession, the court’s conclusions on the credibility of witnesses are entitled to the respect due those made by one who saw the witnesses and heard them testify.
 
 State v. Barton,
 
 02-163, p. 14 (La.App. 5 Cir. 9/30/03), 857 So.2d 1189, 1199-1200,
 
 writ denied,
 
 03-3012 (La.2/20/04), 866 So.2d 817. A trial court’s ruling will not be overturned on appeal unless it is unsupported by the evidence.
 
 Barton,
 
 02-163 at 14, 857 So.2d at 1200.
 

 
 *928
 
 112In this case, the police officers testified that the Defendant was advised of his
 
 Miranda
 
 rights, and that the Defendant did not at any time ask for an attorney, or indicate that he did not want to talk to the officers. The credibility of witnesses at a suppression hearing is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness.
 
 Im-braguglio,
 
 08-64 at 12, 987 So.2d at 264. Based on the evidence, we cannot find that the trial court abused its discretion in finding the police officers’ testimonies more credible in this respect.
 

 b) Right to remain silent and voluntariness of statement
 

 Law enforcement officers are required to explain the special procedural safeguards in
 
 Miranda
 
 to the suspect before initiating a custodial interrogation that deprives the suspect of his freedom of action.
 
 Mollette,
 
 08-138 at 10, 2 So.3d at 467.
 
 Miranda
 
 does not require that a defendant exercise his right to remain silent by any particular phrasing.
 
 State v. Taylor,
 
 01-1638, p. 6 (La.1/14/03), 838 So.2d 729, 739,
 
 cert. denied,
 
 540 U.S. 1103, 124 S.Ct. 1036, 157 L.Ed.2d 886 (2004). However, an interrogation must cease if a criminal suspect indicates in any manner prior to or during questioning that he wishes to remain silent.
 
 Miranda,
 
 384 U.S. at 473-74, 86 S.Ct. at 1612;
 
 Mollette,
 
 08-138 at 9, 2 So.3d at 461. Nevertheless, law enforcement officers are not barred from reinitiating contact with the suspect.
 
 Taylor,
 
 01-1638 at 7, 838 So.2d at 739.
 

 In
 
 State v. Robertson,
 
 97-177 (La.3/4/98), 712 So.2d 8,
 
 cert. denied,
 
 525 U.S. 882, 119 S.Ct. 190, 142 L.Ed.2d 155 (1998), the defendant, who was convicted of first degree murder, claimed the trial court erred in admitting his confession because it was the result of police coercion after he had invoked his right to remain silent. The defendant argued that he invoked his fifth amendment right to remain silent when he responded “uh uh” to questioning about whether he | ]Swanted to say anything more about what happened. The Louisiana Supreme Court found that the defendant’s indication he had nothing further to say about the crimes did not reasonably suggest a desire to end all questioning or to remain silent. Rather, the defendant’s negative reply, “uh uh,” could not plausibly be understood as an invocation, ambiguous or otherwise, to cut off police questioning in all respects. Instead, the defendant’s willingness to talk to authorities even after the “uh, uh” response was indicated by his continuing to respond to questions and to assert his innocence. The Court noted that the defendant never indicated he did not want to speak to the police at all, only that he had nothing to say about the murders. The fact that the defendant continued to speak to police reflected an intent to continue the exchange.
 
 Robertson,
 
 97-177 at 27, 712 So.2d at 31.
 

 In the present case, the Defendant’s statement to the officers that he knew nothing about the murder was not equivalent to an exercise of his right to remain silent. Furthermore, he continued to answer the officers’ questions, which reflects intent to continue the exchange. That intent satisfies the fundamental purpose of Miranda, which is to “assure that the individual’s right to choose between speech and silence remained] unfettered throughout the interrogation process.” See,
 
 Robertson,
 
 97-177 at 27-28, 712 So.2d at 31, quoting
 
 State v. Green,
 
 94-887, p. 10 (La.5/22/95), 655 So.2d 272, 287-88, n. 8. Since the Defendant did not invoke his right to remain silent during questioning, it was permissible for the police to continue to question him.
 

 An accused’s statement obtained by direct or implied promises, or by the exertion of improper influence must be
 
 *929
 
 considered involuntary and, therefore, inadmissible.
 
 Mollette,
 
 08-138 at 10, 2 So.3d at 467. A determination of whether the accused’s waiver of constitutional rights was knowingly and voluntarily made |Mis determined on a case-by-case basis, and rests upon the totality of the circumstances.
 
 Id.; Taylor,
 
 01-1638 at 7, 838 So.2d at 739.
 

 Before an inculpatory statement made during a custodial interrogation may be introduced into evidence, the State must prove beyond a reasonable doubt that the accused was first advised of his
 
 Miranda
 
 rights, that the accused voluntarily and intelligently waived them, and that the accused’s statement was made not made under the influence of fear, intimidation, menaces, threats, inducement or promises. La. R.S. 15:451;
 
 Mollette,
 
 OS-138 at 9-10, 2 So.3d at 467. The State cannot rely on evidence of general disclaimers of inducements or promises.
 
 Mollette,
 
 08-138 at 10, 2 So.3d at 467. Rather, when the defendant’s claims of police misconduct in eliciting a confession are raised, the State must specifically rebut the allegations.
 
 Id.
 

 In
 
 Mollette,
 
 the defendant claimed the trial court erred in denying his motion to suppress his statements because his confession was obtained through threats of arrest made against his family and by the officer pointing a gun pointed towards him. There, the interviewing officer testified that he advised the defendant of his rights and completed the waiver of rights form with the defendant. According to the officer, the defendant verbally acknowledged that he understood his rights and also indicated that he understood his rights by initialing by each one of them on the form. In addition, the defendant acknowledged both verbally and in writing on the form that he wished to waive his rights and give a statement. The officer believed that the defendant clearly understood and acknowledged his rights as he never indicated that he did not understand the process or that he did not want to give a statement. Furthermore, the interviewing officer testified that no threats were made against the defendant or his family during the entire interview process. He denied that the other officer involved in the interview produced, showed, or 11spointed a gun at the defendant during the interview process in order to obtain his statements.
 

 After our review, we concluded that the trial judge did not abuse his discretion in determining the statements were admissible. We noted that the trial judge’s determination of admissibility of a statement and its conclusions on the credibility and weight of the testimony related to the voluntariness of the statement are entitled to great weight and will not be overturned unless unsupported by the evidence.
 
 Mol-lette,
 
 08-138 at 13, 2 So.3d at 469.
 

 In this ease, Major Hay denied that he went into the interrogation room and placed his gun on the table. He said that the Defendant’s claim was an absolute lie. Furthermore, he described the procedure he implemented to prevent this type of accusation which requires any officer to be unarmed when entering an interrogation room.
 

 We find that the trial judge did not abuse his discretion in determining the statements were admissible. The trial judge’s determination of admissibility was based on the credibility and weight of the testimony. As the trial judge’s determination is supported by the evidence, it is entitled to great weight and will not be overturned.
 

 2) Motion for Mistrial
 

 In the second assignment of error, the Defendant contends that the trial judge erred in denying the Motion for Mistrial because the opinion testimony giv
 
 *930
 
 en by Detective Stelly caused substantial harm to his fundamental right to due process.
 

 Detective Stelly testified that he obtained an audio-taped confession from co-defendant Babin. During his testimony, Detective Stelly was asked if Babin admitted to being part of this murder, to which he replied, “Yes, sir.” The defense objected, claiming that the information on the tape was hearsay. Subsequently, 11fiafter the State requested that the tape be played for the jury, the defense moved for a mistrial. The defense claimed that the State’s question was highly prejudicial because Babin did not mention anything on the tape about being part of a murder. After argument, the trial judge listened to the tape and then denied the defense motion.
 

 The Defendant claims that Detective Stelly’s opinion that Babin admitted to committing the murder was a direct “rebuke of his trial strategy” in that it indicated that the Defendant was not guilty because he lacked the intent to cause harm or death to the victim. The Defendant contends that the Detective’s statement also had the effect of portraying the Defendant as a “willing co-participant.”- The Defendant argues that the opinion also was a comment on the Defendant’s guilt, which was a determination to be made by the trier of fact and, therefore, Detective Stelly’s testimony should not have been permitted.
 

 The State responds that Detective Stelly’s statement only relates to the culpability of co-defendant Babin, not the Defendant. Furthermore, the State contends that Detective Stelly’s comment was a true statement of fact. The State argues that because of the overwhelming evidence presented, the comment by Detective Stelly does not rise to the degree of prejudice warranting reversal.
 

 La.C.Cr.P. art. 771 states:
 

 In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
 

 (1) When the remark or comment is made by the judge, the disti’ict attorney, or a court official, and the remark is not within the scope of Article 770; or
 

 (2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless |17of whether the remark or comment is within the scope of Article 770.
 

 In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
 

 See also
 
 State v. Smothers,
 
 02-277, p. 16, 836 So.2d at 559, 569, writ denied, 03-0447 (La.10/10/03), 855 So.2d 329.
 

 La.C.Cr. P. art. 775 states that the defendant’s motion for a mistrial shall be ordered, “when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771.” A mistrial is a drastic remedy that is only authorized where substantial prejudice will otherwise result to the accused.
 
 Smothers,
 
 02-277 at 16, 836 So.2d at 569.
 

 The testimony of a lay witness in the form of opinions or inferences, who is not testifying as an expert, is limited to those opinions or inferences that are rationally based on the perception of the witness and are helpful to a clear understanding of the testimony or the determi
 
 *931
 
 nation of a fact in issue. La. C.E. art. 701;
 
 Imbraguglio,
 
 08-64 at 16, 987 So.2d at 266. The general rule is that a lay witness can only testify to the facts within their knowledge and not to impressions or opinions.
 
 Imbraguglio,
 
 08-64 at 16, 987 So.2d at 266. A lay witness is permitted to draw reasonable inferences from his own personal observations, as long as the lay witness also states the observed facts.
 
 Id.
 

 “Testimony in the form of an opinion or inference otherwise admissible is not to be excluded solely because it embraces an ultimate issue to be decided by the trier of fact.” La. C.E. art. 704. See also
 
 State v. Higgins,
 
 03-1980, p. 21 (La.4/1/05), 898 So.2d 1219, 1284,
 
 cert. denied,
 
 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005). Therefore, the fact that an opinion or inference embraces an ultimate issue in a case does not preclude admissibility. La. C.E. art. 704, 1^Comment (c). See also
 
 State v. King,
 
 99-1279, p. 5 (La.App. 5 Cir. 4/25/00), 760 So.2d 540, 543, writ denied, 00-1498 (La.3/16/00), 787 So.2d 298 and 00-1452 (La.3/16/01), 787 So.2d 298.
 

 A trial judge is required to admonish the jury to disregard a comment made within its hearing that is irrelevant, immaterial or prejudicial to the defendant or the State, when either the defendant or the State requests an admonishment. La. C.Cr.P. ait. 771;
 
 Smothers,
 
 02-277 at 15, 836 So.2d at 569. La.C.Cr.P. art. 771 applies to remarks or comments made by a witness regardless of whether the remark or comment is within the scope of La. C.Cr.P. art. 770.
 
 [5]
 

 Smothers,
 
 02-277 at 16, 836 So.2d at 569.
 

 In
 
 Higgins,
 
 a lay witness was permitted to testify that it appeared to her that a robbery was taking place. The Louisiana Supreme Court found that the trial court did not abuse its broad discretion in admitting the evidence because the lay witness’s observations may have been rationally based on the witness’s perception, as well as the perception of any layperson, of the interaction between the defendant and the victim.
 
 Higgins,
 
 03-1980 at 21-22, 898 So.2d at 1234.
 

 In
 
 Imbraguglio,
 
 this Court found that the police officer’s opinion testimony about the truthfulness of the defendant’s explanations for the injuries sustained by the victim were admissible because it was based on his own personal observations of the defendant throughout the interview process.
 
 Imbraguglio,
 
 08-64 at 16, 987 So.2d at 267.
 

 li3In this case, Detective Stelly said that he assisted State Fire Marshall Carter in obtaining Babin’s recorded confession after Babin’s arrest and after he waived his rights. Furthermore, Babin testified that he gave a free, voluntary, and truthful audio-taped statement to Detective Stelly
 
 *932
 
 implicating all three of the defendants in the events leading to the victim’s death. Therefore, we find that the testimony was admissible as it was based on the Detective’s personal observations. Furthermore, the testimony was cumulative, as well.
 

 The Defendant also claims that Detective Stelly gave a legal opinion regarding the scope of the second degree murder statute. However, a review of the testimony shows that the Detective did not give a legal opinion on the second degree murder statute prior to the trial judge’s ruling on the Defendant’s motion for mistrial. Thus, we find this argument is not supported by the testimony.
 

 3) Error Patent Review
 

 The Defendant requests an error patent review. This Court routinely reviews the record for errors patent in accordance with La.C.Cr.P. art. 920.
 
 State v. Oliveaux,
 
 312 So.2d 337 (La.1975);
 
 State v. Hicks,
 
 08-402, p. 13 (La.App. 5 Cir. 12/16/08), 3 So.3d 539, 547.
 

 Our error patent review reveals that the trial judge failed to correctly notify the Defendant at sentencing of the two-year prescriptive period for filing postcon-viction relief pursuant to La.C.Cr.P. art. 930.8 A, which states in pertinent part, “No application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of
 
 conviction and sentence
 
 has become final.” [Emphasis added.] Here, the sentencing transcript reveals that the trial judge informed the Defendant that he |aihad “two years to file an application for post-conviction relief. That is two years after your
 
 sentence
 
 becomes final.... ” [Emphasis added.]
 

 We have previously held that the failure of the trial court to advise a defendant that the prescriptive period runs from the time his conviction and sentence become final renders the advisement incomplete.
 
 State v. Holmes,
 
 08-719, p. 14 (La.App. 5 Cir. 3/10/09), 10 So.3d 274, 283. In the past, we ordered the trial court to properly advise the defendant of the prescriptive period for filing an application for post-conviction relief pursuant to La. C.Cr.P. art. 930.8 by written notice within ten days of the rendition of this Court’s opinion and then to file written proof in the record that the defendant received the notice.
 
 Id.
 
 However, recently we have chosen to correct this error in the opinion rather than by remanding the case, citing
 
 State v. Morris,
 
 40,322, pp. 4-5 (La.App. 2 Cir. 1/25/06), 920 So.2d 359, 363. See
 
 Holmes,
 
 08-719 at 14, 10 So.3d at 283;
 
 State v. Davenport,
 
 08-463, pp. 10-11 (La. App. 5 Cir. 11/25/08), 2 So.3d 445, 451, writ denied, 2009-0158 (La.10/16/09), 19 So.3d 473,.
 

 We find this procedure an appropriate method of notifying the Defendant of the prescriptive period for post-conviction relief.
 

 Therefore, the Defendant is hereby advised by this opinion that, pursuant to La.C.Cr.P. 930.8, no application for post-conviction relief, including an application which seeks an out of time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La.C.Cr.P. arts. 914 and 922.
 

 Accordingly, the Defendant’s conviction is affirmed.
 

 AFFIRMED
 

 [1]
 

 . A. Second degree murder is the killing of a human being:
 

 (1) When the offender has a specific intent to kill or to inflict great bodily harm; or
 

 (2) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, assault by drive-by shooting, armed robbery, first degree robbery, second degree robbery, simple robbery, cruelty to juveniles, second degree cruelty to juveniles, or terrorism, even though he has no intent to kill or to inflict great bodily harm.
 

 (3) When the offender unlawfully distributes or dispenses a controlled dangerous substance listed in Schedules I through V of the Uniform Controlled Dangerous Substances Law, or any combination thereof, which is the direct cause of the death of the recipient who ingested or consumed the controlled dangerous substance.
 

 (4) When the offender unlawfully distributes or dispenses a controlled dangerous substance listed in Schedules I through V of the Uniform Controlled Dangerous Substances Law, or any combination thereof, to
 
 *923
 
 another who subsequently distributes or dispenses such controlled dangerous substance which is the direct cause of the death of the person who ingested or consumed the controlled dangerous substance.
 

 B. Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
 

 [2]
 

 . The Defendant was originally indicted for first degree murder along with co-defendants, Lawrence Anthony Babin and Bryan Stewart. The indictment was later amended. The cases against the co-defendants were eventually severed.
 

 [3]
 

 . Referred to herein as Detective St. Martin.
 

 [4]
 

 . The Defendant's co-defendant is named Bryan Stewart, but goes by the names Brian Stewart, Brian Stuart, and Brian Gilmore as well. Stewart is also known as "BG."
 

 [5]
 

 . La.C.Cr.P. art. 770 provides:
 

 Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
 

 (1)Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the juiy;
 

 (2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
 

 (3) The failure of the defendant to testify in his own defense; or
 

 (4) The refusal of the judge to direct a verdict.
 

 An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.