LILJEBERG, J.
*418 Defendant appeals his convictions and sentences for several felony offenses. For the following reasons, we vacate defendant's convictions and sentences, and we remand the case to the trial court for a new trial.
STATEMENT OF THE CASE
Defendant, Willard Anthony, was convicted by a jury of aggravated rape (two counts), human trafficking, second degree battery, aggravated battery, sexual battery, and felon in possession of a firearm. The trial court sentenced defendant to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence for each count of aggravated rape, to twenty years imprisonment at hard labor for human trafficking, to ten years imprisonment at hard labor for second degree battery, to ten years imprisonment at hard labor for aggravated battery, to ten years imprisonment at hard labor for sexual battery, and to twenty years imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence for felon in possession of a firearm. The trial court ordered all sentences to run concurrently with each other. Defendant appeals his convictions and sentences.
FACTS
C.W.[1] testified that in April 2015, she was addicted to drugs and "not living a good lifestyle." In order to make money, she was working as a prostitute in Florida, where she first met defendant at a motel in Pensacola. He invited her back to his room, where there were three other women who were also prostitutes. C.W. described that they were all hanging out and drinking, and at some point, defendant, who always kept a gun on him, started "acting really paranoid," picked her up, and "body slammed [her]." C.W. remembered going to sleep at the end of the bed that night but waking up the next day in a car not knowing how she got there. She questioned defendant, who was driving, and he told her they were in New Orleans. C.W. expressed that she wanted to go back to Pensacola, but defendant pointed a gun at her and told her that she was "part of [his] family now."
C.W. stated that after they arrived at a hotel in New Orleans, co-defendant, Pierre Braddy, posted pictures of her and the other women online in order to get clients. The next day, they went to a hotel in Jefferson Parish. C.W. had a solo client appointment so everyone else waited in the car in the parking lot. C.W. testified that she wanted to get away, so she asked the "john" to help her escape. She told defendant that she wanted to leave with the john to make more money, but he said she could not go. C.W. told defendant she was going to tell the client goodbye, but instead, she got in his car and told him to "just go." C.W. and the client pulled out on the highway, but defendant pulled up next to them and pointed his gun at them. C.W. jumped out of the car and started to run, but defendant caught up with her and *419 pulled her back into the car he was driving. C.W. testified that the "girls" started hitting her in the car. Defendant beat her with a belt in the hotel parking lot, at one point strangling her, and she lost consciousness.
When they got back to the hotel room, C.W. took a shower because she was bleeding, but defendant came in and continued to beat her. Defendant continued to verbally antagonize her and hit her with various objects, including his gun. C.W. also testified that defendant made the other girls hit her. She further testified that at the request of defendant, who was armed with a gun, Braddy urinated on her, put his penis in her mouth, and made her swallow the urine. After a while, defendant directed Braddy and the other girls to go to Walmart to buy makeup for C.W. so she could continue to make money.
C.W. testified that while she and defendant were alone in the hotel room, he told her various things that would happen to her if she ever tried to run again. Then, he "forced himself" on her and also inserted his gun into her vagina.
At some point later, Detective Steven Abadie arrived in connection with his investigation, and he was initially undercover as a client. C.W. eventually learned that Detective Abadie was with the police and he took her to the hospital. She was later brought to the Jefferson Parish Correctional Center.
Steven Abadie testified that he was working as a detective with the Jefferson Parish Sheriff's Office Vice Squad in April of 2015. He explained that he investigated prostitution or prostitution-related activities, including human trafficking, and he would go undercover. Detective Abadie went undercover on April 13, 2015, and arranged a "date" with a prostitute at the Sun Suites Inn on Manhattan Boulevard. When he arrived at the hotel room, he encountered Nadia Lee and Brittany Grisby, lying on one of the beds. He also saw C.W., who "was sitting...on her knees and...she was beat." He testified that he had "never seen somebody beat like this," so he knew "there was a pimp involved." He elaborated that her entire face was swollen, with one eye completely shut and a large laceration over her left eye, and she was "black and blue from head to toe." After Detective Abadie exchanged money with Ms. Lee for a "date," he said the code word and the covering officers came in shortly thereafter.
Detective Abadie brought C.W. to the hospital due to her significant injuries. She disclosed to him how she received her injuries, and based on that, he felt the need to investigate crimes other than prostitution, namely aggravated rape, human trafficking, aggravated battery, and second degree battery.
Nadia Lee testified that she met defendant and Braddy in April 2015 at a hotel in Alabama, and she agreed to travel with them to Florida. She explained that she did not initially know that defendant was a pimp. However, Ms. Lee realized soon after they arrived in Florida that he was a pimp. She testified that they used defendant's phone to set up calls, and he made sure the appointments were set up and that the girls would get to and from where they were working. She stated that defendant decided how much money she would charge for each client and "all the money had to go to [defendant]."
Ms. Lee testified that she first met C.W. one night when C.W. mistakenly knocked on their hotel room door, looking for a "john," and defendant invited her in. According to Ms. Lee, defendant indicated that he wanted C.W. to stay and, after a while, C.W. agreed to stay with them. However, shortly thereafter, defendant *420 started treating C.W. very badly, "like beating her up and choke slamming her." Ms. Lee described that early the next morning, they were leaving the hotel, and she told C.W. that she could come with them or stay in the room. C.W. left with them. The group left in two cars, drove to New Orleans, and started receiving clients at a hotel. After they were "caught" by the police at the New Orleans hotel, they relocated to the Sun Suites Inn on the westbank of Jefferson Parish.
Ms. Lee stated that at some point, C.W. had a "date," and everyone else stayed in the car. When it was over, C.W. came down to the car and told defendant that the client wanted to take her to a bar for some drinks, but defendant told her no. Ms. Lee stated that C.W. walked back to the client, got in his car, and they drove off. Ms. Lee described that they chased after them until they caught up with them. Defendant rolled down his window, pointed his gun at the client's car, and told him to let C.W. out of the car. C.W. exited the car and started running away, but defendant caught her. Ms. Lee and Ms. Grisby started hitting C.W. while she was in the car. Ms. Lee stated that in the parking lot of the hotel, defendant started beating C.W. with his belt.
According to Ms. Lee, once they all returned to the hotel room, defendant was angry and told the women to beat C.W. After they took turns hitting her, defendant continued to beat C.W. with a phone receiver and threw a chair at her. Ms. Lee stated that C.W. was bleeding, and defendant told her to lick the blood off of the floor. After this, Braddy, at the direction of defendant, urinated in C.W.'s mouth and on her face. After all this, C.W. looked "unrecognizable" because of how swollen she was; defendant told the other girls to go to the store to get C.W. some makeup for her face "because she was still going to work." The women left for the store with Braddy, leaving defendant and C.W. in the hotel room for about thirty minutes until they returned. Thereafter, Detective Abadie and other officers arrived in connection with the undercover operation, and they were all arrested.
On cross-examination, defense counsel alluded to an alleged deal between Ms. Lee and the State in exchange for her testimony.[2] While Ms. Lee denied that *421 she received any sort of "deal" from the State in exchange for her testimony, she acknowledged that she had not been charged with any offenses in this matter.
Defendant testified in his own defense. He testified that C.W. came willingly with them to New Orleans in order to make more money working as a prostitute. He similarly testified that C.W., Ms. Lee, and the other women were working as prostitutes at a hotel in Jefferson Parish, but he denied being a pimp. Regarding the incident where C.W. tried to leave in a car with a client, defendant testified that C.W. told him she wanted to go to make more money, but she was moving quickly and he did not know if she was being kidnapped. Defendant admitted that he pursued them and pulled a gun on them. Defendant also testified that once C.W. got out of the client's car, she started running, but he did not know what she was running from. Defendant testified that once they caught her, Ms. Lee and Ms. Grisby started to beat C.W. in the parking lot. Defendant denied hitting C.W. with a gun or putting a gun in C.W.'s mouth. He also denied "doing anything" with C.W. while he was alone with her in the room while the others were at Walmart, but he stated that he did have consensual sex with C.W. one morning. Defendant testified that C.W had multiple opportunities to leave, could have left at any time, and was not forced or coerced into staying with them.
Dr. Mark Perlin, the Chief Executive and Scientific Officer of Cybergenetics, a company that assesses genetic data, was qualified as an expert in the field of interpretation of DNA mixtures and their matched statistics. He analyzed the DNA mixture from a swab taken from the interior of the gun recovered in this case. He was able to conclude that neither C.W., nor defendant, nor Braddy could be excluded as contributors. He further concluded that a match between the swab of the gun and C.W. was 1.17 million times "more probable than a coincidental match" to an unrelated Caucasian person; that the match between the firearm and defendant was 1.59 thousand times "more probable than a coincidental match to an unrelated African American person"; and that a match between the firearm and Braddy was 63.2 trillion times "more probable than a coincidental match to an unrelated African American person."
The jury also heard testimony from the screening prosecutor for this case, Assistant District Attorney Thomas Block. Mr. Block testified that he did not offer Ms. Lee a deal in exchange for her testimony in this matter. Mr. Block's testimony is discussed in detail, infra , as it is the subject of defendant's first assignment of error.
LAW AND DISCUSSION
In his first assignment of error, defendant argues that he was denied his right to a fair trial, to the presumption of innocence, and to confront the actual evidence against him when the prosecution was permitted to elicit extensive and improper testimony from the screening prosecutor in the case. He asserts that the State's case for human trafficking and aggravated rape rested heavily on the testimony of C.W. and Ms. Lee, both of whom posed significant credibility problems. Defendant argues that in order to compensate for this, the State presented the testimony of *422 Thomas Block, the screening attorney who brought this case before the grand jury. Defendant urges that instead of providing brief testimony to establish that Ms. Lee had not been offered a deal in exchange for her testimony, Mr. Block testified extensively about "his own opinions about the merits of the case." He argues that given the credibility problems of the eyewitnesses and the weight the jurors would have naturally given a prosecutor, Mr. Block's testimony was critical to the prosecution's ability to carry its burden of proof. He also argues that in Mr. Block's testimony, he vouched for the credibility of Ms. Lee and C.W., and he expressed his belief that defendant was guilty.
The State first responds with a procedural objection, arguing that defendant did not object to Mr. Block testifying as to defendant's guilt and, thus, this issue has not been preserved for appeal. However, our review of the numerous objections and motions for mistrial made during Mr. Block's testimony, involving objections to hearsay, opinions on the credibility of State witnesses, improper invasion of grand jury proceedings, and relevance, were sufficient to preserve the arguments defendant raises on appeal. The arguments in support of the defense objections necessarily included the issue of opinion testimony regarding defendant's guilt.
The State further responds that Mr. Block's testimony never suggested, nor did defendant show, that his testimony and/or alleged opinions were based, expressly or implied, on evidence outside the record. The State urges that his testimony was not impermissibly based upon something uniquely within his personal knowledge, but on "facts, reports, and forensic evidence." The State further argues that the defense implied that Ms. Lee received favorable treatment and would lie to avoid going to jail, so the State was entitled to rebut this implication with Mr. Block's testimony. Finally, the State contends that if there was error in allowing the testimony of Mr. Block, any such error was harmless.
After Ms. Lee testified, the State called Thomas Block to the stand. Mr. Block testified generally about his job as a screening attorney for the Jefferson Parish District Attorney's Office and how his office decides to charge individuals with a crime following their arrest. He then spoke generally about grand juries, indicating that he presents evidence to a grand jury, which decides whether or not to issue an indictment. Mr. Block testified that he has an obligation not to present what he believes to be perjured testimony to a grand jury. At this point, defense counsel lodged his first objection-"with respect to the witness testifying as to his belief of the credibility or lack of credibility of the witness that testifies before the grand jury ... I don't think it's relevant." The State responded that it was only addressing questions of an earlier witness and "earlier comments during jury selection" where defendant "spoke to the subject matter of a grand jury," and the objection was overruled. The objection, however, continued into a bench conference, where defendant continued to argue that Mr. Block was "endorsing the testimony of this witness because he believes she was telling the truth." The trial court overruled the objection again, and defendant moved for a mistrial, which was denied.
When the prosecutor asked about Mr. Block's obligation to make a full and fair presentation of accurate information to the grand jurors, he stated:
Yes. In fact, the only evidence that I present to a grand jury would be evidence that would be legally admissible in a court of law. I have a responsibility based upon my oath that I have taken to be an Assistant District Attorney as well *423 as an officer of the Court and I take my job very seriously.
Mr. Block agreed that there are "certain instances when a case comes to [him] because there is someone who is facing potential life imprisonment ... [and] there [are] sometimes other individuals who are arrested in connection with the same incident who are facing less serious charges." The State asked Mr. Block how he handles the screening process for those individuals who are not facing life imprisonment. Defendant objected again, arguing "the issue involves grand jury secrecy." The trial court overruled the objection noting that the question did not relate to grand juries.
Mr. Block testified that he screened the charges against the individuals arrested in this matter, and he presented an indictment of defendant and Braddy to the grand jury, but did not file charges against Ms. Grisby or Ms. Lee. The State asked Mr. Block what steps he would take if he believed it was not appropriate to file charges against someone, over defendant's "ongoing objection." Mr. Block testified that, "you have to meet the elements of the offense in order to charge the person and each and every element of the offense must be met beyond a reasonable doubt and to the satisfaction of the trier of fact." He was asked by the State:
Assuming for the moment that this jury has heard sufficient information to persuade them that Nadia Lee committed one or more crimes, including prostitution and battery here in Jefferson Parish, would that information that they are aware of be something that you were aware of when you screened the case?
Mr. Block replied:
Yes, I was aware. I had police reports and I had interviews that the detectives had done with both of the ladies, Ms. Grisby and Ms. Lee, that I was aware of. And based upon the totality of the circumstances as it relates to-
Defense counsel objected to the hearsay nature of this testimony, but was overruled. Mr. Block continued:
Based upon the actions of Willard Anthony, in particular, there is an affirmative defense to the "crimes" quote, unquote-I'll put a quote around "those crimes"-committed by say for instance, Nadia Lee, she has an affirmative defense to the charges of prostitution or say crime against nature insofar as she was a victim of human trafficking as a result of his actions, Willard Anthony's actions.
Defendant then lodged another "ongoing objection."
Mr. Block testified that the reason the Louisiana Legislature enacted law providing an affirmative defense to prostitution and related charges for victims was, "[t]hey understand the victimization and the abuse that victims have to endure at the hands of their pimp's physical, emotional, psychological abuse and they understand that although they may have committed a crime, they did it at the behest of the pimp." Defendant lodged another objection, that Mr. Block was "giving an opinion as to the credibility of Ms. Lee," with the trial court noting that it did not "believe he's giving an opinion." Defendant continued objecting "to hearsay" and that the prosecutor could not "testify personally, his personal opinion based on this." The trial court noted that it did not believe Mr. Block had done that, but the court asked the State to ask a question to prevent a narrative. The State explained Mr. Block was testifying to "explain all the reasons why Ms. Lee and Ms. Grisby were not charged and that none of them had to do with giving either one of them a deal." Defense counsel moved again for a mistrial, which was denied.
*424 Mr. Block continued to explain why charges were not filed against Ms. Lee and Ms. Grisby for the second degree battery of C.W.:
the second degree batteries that both ladies were facing, although they struck the victim, [C.W.], they did so because they were told to do so by Willard Anthony and they recognized that if they did not comply with his demands to beat [C.W.] after he had already beaten her, that they themselves would have sustained beatings.
Defendant objected again based on hearsay, arguing in a bench conference that "he is saying he found her to be credible ... he's commenting that with all of his experience he found her to be a credible-honest witness," "he's already commented on the credibility of at least two of the women," and that Mr. Block was "about to comment on [C.W.'s] credibility." The court overruled the objection. Defendant moved for a mistrial again, which was denied.
The prosecutor then asked Mr. Block what information he had developed during his interview with C.W. that persuaded him to not charge Ms. Lee or Ms. Grisby with battery upon C.W. Mr. Block answered:
That she was-she being [C.W.]-was aware that the only reasons Ms. Grisby and Ms. Lee participated in the battery upon her were as a result of orders by this defendant, Willard Anthony, instructing them to beat her and that if they did not comply with his demands, [C.W.] believed that they would have been beaten as well.
When the prosecutor asked why Ms. Lee and Ms. Grisby were not charged with possession of cocaine, since cocaine was found in the hotel room, Mr. Block explained the difference between actual and constructive possession and then stated:
We know or I knew based upon the investigation that the defendants, Pierre Braddy and Willard Anthony, were using drugs as a means to get the three ladies or the three female victims to commit the crimes for them as it relates to human trafficking.
Mr. Block testified that he did not offer Ms. Lee a deal in return for her testimony. When asked if he had officers take Ms. Lee to a shelter in order to "curry some favor with her," Mr. Block explained:
She's a victim. In no uncertain term, she's a human being. She deserves respect. She deserves protection under the law.
Morally, I don't believe that it would have been right...To turn her back out onto the street to do what? She wanted to get help to get out of the lifestyle that she found herself in, that Willard Anthony took advantage of and perpetuated.
And there was no-other than if you want to say we did the right thing, there was no expectation of a promise or a reward. Ultimately, she was going to have to come before you, ladies and gentlemen, and tell her story and then it would be up to you to determine whether or not you believed her.
Defendant objected again with "an ongoing objection."
On cross-examination, defense counsel attempted to question Mr. Block about the grand jury proceedings in this case. The State's objections were sustained several times regarding questions about specific testimony in the grand jury proceedings, with the trial judge ultimately ruling that she was "going to sustain the objection to all questions regarding the grand jury in this particular case." In a bench conference, defense counsel continued to argue that Mr. Block vouched for the credibility of the witnesses, and the trial court stated:
*425 I disagree with your interpretation of his testimony. He has never vouched for their personal credibility. He has testified as to what he has done regarding the screening process and the affirmative defenses available to these women which went into his determination whether or not to accept charges or not accept charges.
To defeat the cross-examination of Ms. Lee wherein it was implied that there was some deal made with Ms. Lee for an exchange for her testimony, I am, again, going to tell you I will continue to sustain any objection and I am ordering you, at this point, to no longer ask questions about this particular grand jury.
Defendant again moved for a mistrial, which was denied. Cross-examination of Mr. Block then continued. When defense counsel asked if Mr. Block believed Ms. Lee and Ms. Grisby should not be charged in Louisiana based on what he was told, Mr. Block stated:
Based upon the totality of the circumstances, not just other witnesses' testimony, but corroboration of physical evidence located from the scene, physical evidence, as well as ultimately what turned out to be DNA evidence, yes, their statements were corroborated as to this defendant's actions.
When defense counsel asked Mr. Block if he knew anything about C.W.'s failure to notify the police in New Orleans that she had been kidnapped or "forced to prostitute" when she had the opportunity, Mr. Block replied:
I do. I do. I know that Willard Anthony assaulted her with a handgun; threatened to kill her; beat her; strangled her; choked her to the point of unconsciousness. Yeah, I know that she was afraid to come forward and I'm sure the jury, if they haven't heard, they'll hear from her as to the circumstances about when and under what circumstances she finally disclosed to law enforcement.
Defense counsel asked if Mr. Block had questioned C.W. as to why she did not ask the police for help when she was stopped by the police in Gretna and cited for prostitution. Mr. Block explained that he did ask C.W. and:
[S]he explained to me to my satisfaction why she felt that she would not, it would not be in her best interest based upon the treatment that she had endured at the hands of Willard Anthony and Pierre Braddy.
And, of course, I didn't just take her word for it. I looked at other evidence, physical evidence, corroboration, and other witnesses' testimony, being witnesses, being Ms. Lee and Ms. Grisby's testimony as, as it related to what happened to [C.W.] and it made perfect sense to me why she would not tell the police.
Defense counsel then stated that C.W. was not physically abused until after the instances with the police, to which Mr. Block replied, "That is absolutely incorrect."
On redirect, Mr. Block indicated that in addition to reviewing the statements that Ms. Lee, Ms. Grisby, and C.W. made to the police, he had the opportunity to speak with C.W. for several hours. He also indicated there was consistency between what Ms. Grisby and Ms. Lee said in their interviews. Defendant objected "to commenting on testimony we haven't heard," and the trial court directed the State to rephrase its question. Later, Mr. Block testified that if Ms. Lee or Ms. Grisby refused to testify or made themselves unavailable, he would not file charges against them but would seek a material witness warrant.
*426 Defendant challenges several portions of Mr. Block's testimony, stating that he gave extensive testimony in which he vouched for the credibility of C.W. and Ms. Lee, offered improper legal opinions about the merits of the case, and expressed his belief that defendant was guilty, "all while improperly invoking the character and prestige of the D.A.'s office," which denied his rights to a fair trial, the presumption of innocence, and to confront the actual evidence against him.
The testimony of a lay witness in the form of opinions or inferences, who is not testifying as an expert, is limited to those opinions or inferences that are rationally based on the perception of the witness and are helpful to a clear understanding of the testimony or the determination of a fact in issue. La. C.E. art. 701 ; State v. Keller , 09-403 (La. App. 5 Cir. 12/29/09), 30 So.3d 919, 930-31, writ denied , 10-267 (La. 9/17/10), 45 So.3d 1041. The general rule is that a lay witness can only testify to the facts within their knowledge and not to impressions or opinions. Id.
With regard to the issue of whether prosecutors are permitted to testify at a trial, the jurisprudence provides that a prosecutor may assume the dual role of witness and advocate only under "extraordinary circumstances." State v. Miller , 391 So.2d 1159, 1162-1163 (La. 1980). When the State is presented with "surprising testimony," appellate courts have allowed the prosecutor to testify as a rebuttal witness. State v. Diaz , 93-1309 (La. App. 3 Cir. 4/6/94), 635 So.2d 499, writ denied , 94-1189 (La. 9/16/94), 642 So.2d 191. The danger in allowing a prosecutor to assume the role of witness is that the jury might give inordinate weight to the prosecutor's testimony. Miller , 391 So.2d at 1162.
In Miller , 391 So.2d at 1162, the Louisiana Supreme Court recognized that a prosecutor may be a competent witness, but it noted that district attorneys should avoid the dual role of prosecutor and witness. "The general rule, governing all lawyers, prohibits testimony by attorneys who are engaged in the trial of the case, (Code of Professional Responsibility, DR 5-101(B), 102) except in isolated circumstances. Even stronger reasons weigh against testimony by a prosecutor." Miller , 391 So.2d at 1163. In Miller , despite the defendant's request that the prosecutor be replaced, the Court found that any possible error in allowing the prosecutor to both testify and remain as prosecutor was harmless. The Court noted that the prosecutor had been called as an impeachment witness and his testimony was cumulative of other witnesses' testimony. See also State v. Rowe , 489 So.2d 1069 (La. App. 1 Cir. 1986) ; State v. Blunt , 449 So.2d 128 (La. App. 4 Cir. 1984).
Courts of this state have also allowed a prosecutor, who was not the prosecuting trial attorney, to testify as an impeachment witness, noting that the prosecutor "did not assume a dual role." See State v. Wilson , 602 So.2d 779 (La. App. 2 Cir. 1992).
In this case, Mr. Block was not the prosecuting attorney at trial and did not assume a dual role. Rather, he was the attorney who screened the case for the District Attorney's Office. Although a prosecutor should only be called as a witness in very exceptional circumstances, we cannot say that it was error to allow Mr. Block to testify in this matter to rebut the defense implication that a State witness, Nadia Lee, was given "a deal" in exchange for her testimony. However, there are limitations to such testimony, and the fundamental rights of the defendant cannot be violated. Our review reveals that Mr. *427 Block's testimony exceeded the scope permissible for a fair and impartial trial.
The right to a fair trial is a fundamental liberty secured by the Sixth Amendment through the due process clause of the Fourteenth Amendment to the United States Constitution. State v. Jones , 98-1165 (La. App. 3 Cir. 2/3/99), 734 So.2d 670, 672 ; State v. Edwards , 591 So.2d 748 (La. App. 1 Cir. 1991), writ denied , 94-452 (La. 6/21/96), 675 So.2d 1072. The presumption of innocence, although not articulated in the United States Constitution, is a basic component of a fair trial under our system of criminal justice. Id. Pursuant to Article I, § 16 of the Louisiana Constitution, every person charged with a crime is presumed innocent until proven guilty and is entitled to an impartial trial. The right to the presumption of innocence is inviolable. Jones , 734 So.2d at 673.
A prosecutor cannot vouch for the credibility of a witness or use the prestige of the District Attorney's Office to bolster its case. State v. Kaufman , 304 So.2d 300 (La. 1974). When a prosecutor vouches for the credibility of witnesses and expresses his personal opinion regarding the guilt of the accused, it poses two dangers: 1) such comments can convey the impression that there is evidence that was not presented to the jury, but known to the prosecutor, to support the charges against the defendant and thus, it can jeopardize the defendant's right to be tried solely on the evidence presented to the jury; and 2) the prosecutor's opinion carries with it the imprimatur of the government and it may induce the jury to trust the government's judgment rather than its own view of the evidence. U.S. v. Young , 470 U.S. 1, 105 S.Ct. 1038, 1048, 84 L.Ed.2d 1 (1985).
Also, a prosecutor's statement of personal opinion regarding the defendant's guilt or credibility is generally considered error when the statement is made in such a manner that the jury might conclude that the prosecutor's opinion is based on evidence outside the record. However, an expression of the prosecutor's opinion based on evidence within the record is permissible. State v. Weidert , 568 So.2d 1162, 1166 (La. App. 5 Cir. 1990), writ denied , 573 So.2d 1118 (La. 1991) ;[3] State v. Motton , 395 So.2d 1337 (La. 1981), cert. denied , 454 U.S. 850, 102 S.Ct. 289, 70 L.Ed.2d 139 (1981) ; State v. Smith , 461 So.2d 1155 (La. App. 3 Cir. 1984).
In the present case, considering the entirety of Mr. Block's testimony, we find that defendant did not receive a fair trial. Unlike many reported cases in which a defendant claims that the trial prosecutor made improper comments during opening statements, closing arguments, or trial, the present case involves a situation in which the screening prosecutor was called as a witness and provided testimony that covers approximately 70 pages of transcript. Mr. Block did not simply testify regarding the lack of any "deal" with Ms. Lee or other State witnesses in exchange for their testimony. Rather, Mr. Block vouched for the credibility of the State witnesses and improperly commented on defendant's guilt, while using the prestige and dignity of his office to bolster the State's case.
Mr. Block testified before the jury that he has been an Assistant District Attorney in the Jefferson Parish District Attorney's Office since 1997, and he testified regarding some of his professional experience. He *428 also testified regarding the general screening and grand jury processes. We agree that Mr. Block's testimony regarding his qualifications and experience was necessary to establish a foundation for his testimony regarding the screening process. See La. C.E. art. 602. However, during his testimony, Mr. Block continued to emphasize his position as a representative of the government, stating:
[T]he only evidence that I present to a grand jury would be evidence that would be legally admissible in a court of law. I have a responsibility based upon my oath that I have taken to be an Assistant District Attorney as well as an officer of the Court and I take my job very seriously.
In response to the State question as to whether Mr. Block made a deal with Ms. Lee in return for her testimony, Mr. Block replied:
No. In fact, to the contrary. I have a responsibility as I mentioned to you before and an obligation as an officer of the Court and a representative of the people of Jefferson Parish and the State of Louisiana not to just charge someone with an offense that cannot be proved under the law or beyond a reasonable doubt.
Then again, when the State asked if he would prosecute one of the witnesses if they were not able to be located and never came to court testify, Mr. Block said no and then elaborated:
I have, I have a responsibility and obligation as an officer of the Court when I was sworn in in 1993 as a lawyer and then sworn in as a prosecutor to prosecute in good faith pursuant to the laws in the State of Louisiana and take only those cases that we can prove beyond a reasonable doubt, a good faith prosecution, not a bad faith or an [sic] vindictive prosecution which is what that would be. I would never do that.
Defendant complains that Mr. Block improperly vouched for the credibility of the State witnesses, and his testimony could have conveyed the impression that there was evidence not presented to the jury, but known to Mr. Block, to support the charges against defendant. "Attempts to bolster a witness by vouching for his credibility are normally improper and error. The inquiry should be whether the prosecutor's expression might reasonably lead the jury to believe that there is other evidence, unknown or unavailable to the jury, on which the prosecutor was convinced of the accused's guilt." United States v. Ellis , 547 F.2d 863, 869 (5th Cir. 1977).
Mr. Block indicated he reviewed the statements made by Ms. Grisby, Ms. Lee, and C.W. to the police, and that he spoke with C.W. for several hours. He also stated that there was consistency between the interviews of Ms. Lee and Ms. Grisby. However, Ms. Grisby did not testify at the trial of this matter.
When defense counsel asked again about why Ms. Lee was not charged with a crime, Mr. Block stated:
Based upon the totality of the circumstances, not just other witnesses' testimony, but corroboration of physical evidence located from the scene, physical evidence, as well as ultimately what turned out to be DNA evidence, yes, their statements were corroborated as to this defendant's actions.
While testimony and evidence regarding physical and DNA evidence were certainly presented at trial, the jury could have believed that Mr. Block was aware of further evidence that was not presented to the jury. Mr. Block also stated during his testimony that he "knew based on the investigation" that defendant used drugs *429 as a means to get the victims "to commit the crimes for them as it relates to human trafficking."
The record further shows that Mr. Block expressed his opinion as to defendant's guilt. Mr. Block repeatedly referred to Ms. Lee and C.W. as victims of defendant. He stated that although Ms. Lee and Ms. Grisby struck C.W., "they did so because they were told to do so by Willard Anthony" and they knew they would sustain beatings if they did not comply with his demands. He also stated that "[b]ased on the actions of Willard Anthony," Ms. Lee had an affirmative defense to the prostitution charges, "insofar as she was a victim of human trafficking as a result of his actions, Willard Anthony's actions." He further stated:
I know that Willard Anthony assaulted her with a handgun; threatened to kill her; beat her; strangled her; choked her to the point of unconsciousness. Yeah, I know that she was afraid to come forward. (Emphasis added.)
Also, when questioned by defense counsel as to why C.W. did not ask the police for help, Mr. Block stated:
[S]he explained to me to my satisfaction why she felt that she would not, that it would not be in her best interest. Let's just say, it would not be in her best interest based upon the treatment that she had endured at the hands of Willard Anthony and Pierre Braddy.
When defense counsel stated that C.W. was not physically abused until after "those instances with the police," Mr. Block replied, "That is absolutely incorrect."
Based on the foregoing, we find that the trial court erred by allowing Mr. Block to testify beyond what was necessary to rebut the defense's implication that Ms. Lee was given a "deal" in exchange for her testimony. The testimony regarding defendant's guilt and Ms. Lee and C.W.'s credibility, coupled with the emphasis on Mr. Block's position as a prosecutor and a representative of the citizens of Jefferson Parish and the State of Louisiana, infringed on defendant's presumption of innocence and prevented him from receiving a fair trial.
The State argues that even if portions of Mr. Block's testimony were improper, any error in its admissibility was harmless, considering the overwhelming evidence of defendant's guilt. The Louisiana Supreme Court has adopted the federal test for harmless error announced in Chapman v. California , 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), as refined by Sullivan v. Louisiana , 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993), which asks whether the guilty verdict rendered in this trial was surely unattributable to the error. State v. Thompson , 15-886 (La. 9/18/17), 233 So.3d 529, 561. However, there are exceptions to the harmless error rule because some constitutional rights are so basic to a fair trial that the violation of those rights can never be considered harmless error. Thompson , 233 So.3d at 561, citing Weaver v. Massachusetts , --- U.S. ----, 137 S.Ct. 1899, 1907, 198 L.Ed.2d 420 (2017).
Before applying a harmless error analysis, it must be determined if the error complained of is a trial error or a structural error. Jones , 734 So.2d at 673.
A "trial error" is one which occurs during the presentation of the case to the jury and can be quantitatively assessed in the context of other evidence presented to prove guilty. A "structural error" affects the framework within which the trial proceeds, rather than an error in the trial process. It defies harmless error standards and cannot be quantitatively measured.
*430 Jones , 734 So.2d at 673, citing Arizona v. Fulminante , 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).
The purpose of the structural error doctrine is to ensure the insistence on certain basic, constitutional guarantees that should define the framework of any criminal trial. Thompson , 233 So.3d at 561.
In Jones , supra , the appellate court found that a prosecutor's comments during argument were improper and violated the defendant's constitutional right to the presumption of innocence. The Court noted that although not every violation of a constitutional or statutory right requires reversal of a conviction, some rights are so basic to a fair trial that their infraction cannot ever be treated as harmless error, including the presumption of innocence. Jones , 734 So.2d at 673. The Court stated, "[t]he right to the presumption of innocence is sancrosanct; it is inviolable." Id.
Because the errors in the present case violated defendant's right to a fair trial and the presumption of innocence, we find that they are structural errors affecting the framework of the trial to which harmless error standards cannot be applied. Accordingly, finding that defendant has not received a fair trial in this matter, as guaranteed by the laws of this state and our country, we vacate defendant's convictions and sentences on all counts and remand for a new trial.
Considering our decision to vacate defendant's convictions and sentence, we pretermit discussion of defendant's remaining assignments of error.
ERRORS PATENT
The record was reviewed for errors patent, according to La. C.Cr.P. art. 920 ; State v. Oliveaux , 312 So.2d 337 (La. 1975) ; and State v. Weiland , 556 So.2d 175 (La. App. 5 Cir. 1990). Considering our decision to vacate defendant's convictions and sentences, our review reveals no errors requiring corrective action at this time.
DECREE
For the foregoing reasons, we vacate defendant's convictions and sentences on all counts, and we remand to the trial court for a new trial.
CONVICTIONS AND SENTENCES VACATED; REMANDED FOR NEW TRIAL

To observe the principle of protecting minor victims and victims of sex offenses set forth in La. R.S. 46:1844(W), the victim will be identified by initials only.

During Ms. Lee's cross-examination, the following exchange occurred:
Q: Okay and when this case is over...when the jury makes a decision based, based part, part on your testimony at this point, what do you expect to happen to you?
A: I do not know. In regards to what?
Q: Well, let me see. There's prostitution, at least two situations...[w]hat's to happen to you with respect to the prostitution charges, both of those?
A: I mean, if I have to deal with them, then I have to deal with them, my past so.
Q: What is to happen to you with respect to the cocaine you had?
A: I have to deal with it.
Q: I see. And, and what is to happen to you with respect to the armed robbery?
A: I'm, actually, in the motions of working on that now.
* * *
Q: And, and I think a fair question to you is: You certainly expect the District Attorney's Office to help you with all that, correct?
A: No.
Q: You don't?
A: No.
Q: Think about it. You-
A: They told me they didn't, no.
Q: They don't-they talked about that with your lawyer. Do you know what they told your lawyer?
* * *
A: I'm assuming the same thing they told me.
Q: What's that?
A: Was that they would, they would tell them facts but that's it, that they couldn't help me in any way and they didn't have a personal opinion on what should happen to me.
* * *
Q: All this time your lawyer hasn't told you what the penalties [for possession of cocaine, two counts of prostitution, for a principal in an armed robbery in Florida] are? Come on. Are you telling them the truth?
A: Yeah.

Although case law citing improper comments of a prosecuting attorney does not directly apply where the prosecutor was not called as a witness, such cases offer guidelines by which the screening prosecutor's testimony in this case can be evaluated.